

Signed/Docketed
April 26, 2012

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
# The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 11-25510 MER |
| ADAM RENTERIA ) | |
| MONIQUE MAREE RENTERIA ) | Chapter 13 |
| ) | |
| Debtors. ) | |

## ORDER

This matter comes before the Court on the confirmation of the Debtor's Amended Chapter 13 Plan, and the Chapter 13 Trustee's Objection thereto. The Court has reviewed the file and considered the legal arguments presented by the parties, and hereby makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L), as it involves the confirmation of a plan.

## BACKGROUND FACTS

On June 29, 2011, the Debtors, Adam and Monique Renteria (the "Debtors"), filed their voluntary Chapter 13 petition and their initial Chapter 13 Plan. On September 26, 2011, the Debtors filed their Amended Chapter 13 Plan, which provides for total distribution of $2,945 to Class 4 unsecured creditors. The Amended Plan also provides the Debtors shall continue to service their student loan debt outside the plan, and the student loan creditors shall not share in the Class 4 distribution. The Debtors rely on 11 U.S.C. § 1322(a)(5)[1] for the proposition they may make such payments because the payments are for unsecured debts for which the last payment is due after the last date of the plan. In addition, the Amended Plan notes the Debtors are under the median income for a family of four according to their Form 22 C.

The Chapter 13 Trustee's Objection asserts the Amended Plan unfairly discriminates among unsecured creditors, pursuant to §§ 1321(b)(2) and 1325(a)(1). The Trustee notes the Debtors propose to pay the student loan creditors $550 per month, for $33,000 over the 60-month life of the plan, while paying non-student loan

---

[1] Unless otherwise noted, all future statutory references in the texts are to Title 11 of the United States Code.

unsecured creditors only $2,945. Therefore, the matter to be determined by the Court is whether the payments "outside the plan" to the nondischargeable, unsecured student loan creditors result in "unfair discrimination" under §1322(b)(1).

## DISCUSSION

Section 1322(b)(1) provides: "the plan may. . . designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated." As Judge Elizabeth E. Brown of this Court has noted, payment to a creditor, such as a student loan creditor, "outside the plan," *i.e.* as a recurring expense not covered by the plan provisions or paid through the Chapter 13 Trustee, can constitute an implicit classification.[2]

Section 1322(b)(5) goes on to provide:

> a plan may. . . provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due. . . .

In *Sharp*, as well as in other cases, courts have found payments "outside the plan" to student loan creditors did not constitute unfair discrimination in violation of § 1322(b)(1) if the payments came from funds which were not part of the debtor's calculation of "projected disposable income" ("PDI") on Official Bankruptcy Form 22C.[3] The key, however, is that while discrimination may be allowable for long-term debt pursuant to § 1322(b)(5), the discrimination must not be unfair under § 1322(b)(1).[4]

In *Sharp*, the PDI of the debtors in question was able to be determined by analysis of Form 22C, because the debtors were above-median income debtors. The situation before this Court is somewhat different because the Debtors here are below-median income debtors, whose PDI cannot be determined from Form 22C. In this case, therefore, the Court must follow a different path to find whether the proposed student

---

[2] *In re Sharp*, 415 B.R. 803, 807 (Bankr. D. Colo. 2009) (citations omitted).

[3] *Sharp*, *supra*, at 812 ("To hold otherwise would subvert the disposable income test in § 1325(b) by requiring a debtor to pay more than PDI to unsecured creditors."); *See also In re Abaunza*, 452 B.R. 866, (Bankr. S.D. Fla. 2011) ("Where all PDI was being paid to those unsecured creditors, the courts have held there was no unfair discrimination. Conversely, where the debtor proposed to use his or her PDI to pay all creditors, including creditors separately classified (in or out of the plan) and differently treated, the courts have reverted to a fact-based analysis. . . ."); *In re Orawsky*, 387 B.R. 128, 148-156 (Bankr. E.D. Pa. 2008) (holding since an above-median debtor's PDI was zero, and since the debtor proposed to pay general unsecured creditors approximately 12.6% of their claims, while maintaining regular, unaccelerated student loan payments outside the plan, the plan did not unfairly discriminate under § 1322(b)(1)).

[4] *See In re Boscaccy*, 442 B.R. 501, 507 (Bankr. N.D. Miss.,2010).

loan payments represent a permissible classification under § 1322(b)(5), or whether they unfairly discriminate under § 1322(b)(1).

In discerning that alternative path, the Court must begin with an analysis of § 1325(b)(1)(B), because the Trustee has objected to confirmation:

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan . . . .
>
> > (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

The first question to be answered, then, is whether the Debtors have projected disposable income for purposes of § 1325(b)(1)(B).

Although § 1325(b)(1)(B)(2) defines "disposable income" as "current monthly income received by the debtor . . . less amounts reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor," a definition for "projected disposable income" does not appear in the Bankruptcy Code.

> The term "current monthly income"–
>
> (A) means the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during the 6-month period ending on-
>
> > (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
> >
> > (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and
>
> (B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor. . . .[5]

---

[5] § 101(10A).

"Current monthly income" ("CMI") is a snapshot of a debtor's income for the six-month period prior to the filing of a debtor's bankruptcy petition.[6] It is a misnomer, inasmuch as it reports a debtor's average historical income which may or may not be reflective of a debtor's actual current monthly income on the petition date.[7]

Calculation of disposable income, as defined by § 1325(b)(2), begins with the CMI, and subtracts amounts reasonably necessary for the maintenance or support of the debtor or a dependent, domestic support obligations, and charitable contributions. In the case of above-median income debtors, § 1325(b)(3) provides the subtracted amounts are determined by the formula stated in §§ 707(b)(2)(A) and (B), the abuse provisions.[8] To accomplish this, Bankruptcy Form 22C directs above-median income debtors to check a box at the top of the form stating "Disposable income is determined under § 1325(b)(3)" and to complete the remaining portions of the form, which calculate the deductions allowed under § 707(b)(2) and disposable income under § 1325(b)(2).

However, although FED. R. BANKR. P. 1007(b)(6) provides that all Chapter 13 debtors shall file a statement of CMI, only above-median income debtors are directed to make the calculations of disposable income. In addition, if a debtor's CMI is below-median, the Code provides no formula to supplement the § 1325(b)(2) definition for calculation of the allowed expenditures similar to that for above-median income debtors. As in this case, that means Form 22 C is not useful for determining disposable income.

Realistically, the loss of Form 22C as a calculating tool for below-median income debtors leaves Schedules I and J.[9] The Trustee has not objected to the accuracy of the Debtors' stated income on either Form 22 C or Schedule I, nor has she objected to the reasonableness of any of the expenses stated on Schedule J, with the exception of the $550 per month student loan payment. The Debtors' Schedules I and J reflect monthly net income of $186, precisely the amount of the monthly plan payment in the Amended Plan. Thus, the Debtors possess disposable income pursuant to § 1325(b)(2).

This finding leads to the second question which must be answered--whether the Debtors, who are contributing to the plan $186 per month in disposable income, must also contribute the $550 per month they have set aside as a student loan payment expense. To answer that question, the Court must consider whether the $550 per

---

[6] *In re Edmondson*, 363 B.R. 212, 214 (Bankr. D. N.M. 2007).

[7] *Id.*, at 214 (citing *In re Girodes*, 350 B.R. 31, 36 (Bankr. M.D. N.C. 2006) ("CMI is based on a historical average and may or may not reflect the financial condition of the debtor at the time of filing.")).

[8] § 1325(b)(3).

[9] *See In re Reeves*, 405 B.R. 135, 138 (Bankr. D. Del. 2009) (recognizing the 2005 amendment to § 1325(b) did not change, for below median-income debtors, the pre-2005 practice of subtracting reasonable, necessary expenses from Schedule J from income on Schedule I).

month proposed to be paid for student loan debt creates unfair discrimination between the class of non-student loan unsecured creditors and the class of student loan unsecured creditors.

Two published cases address whether a separate student loan payment constitutes unfair discrimination in cases involving below-median debtors. The Court finds these cases particularly useful in evaluating the current case, as they address the difference between an above-median income debtor and a below-median income debtor for purposes of § 1322(b)(1).[10]

In *In re King*, the United States Bankruptcy Court for the Northern District of Texas, relying on an earlier opinion, stated:

> This court previously addressed the issue of unfair discrimination in *In re Simmons*, 288 B.R. 737 (Bankr. N.D. Tex. 2003). There were four plans before the court in *Simmons*, each of which discriminated in favor of a separately designated class of claims consisting of student loan debt. As an initial matter, *Simmons* required that all of the claims in the specially designated class be substantially similar. *Id.* at 753. . . .
>
> This court then applied a two-prong test to determine whether or not discrimination in a plan is unfair (the "*Simmons* Test"). *Id.* at 751. The first prong of the *Simmons* Test requires that the discrimination serve a rational purpose of the debtor. *Id.* This court held that separate classification of student loan debt serves a rational purpose. *Id.* at 752.
>
> The second prong of the *Simmons* Test states that discrimination is not unfair if the class discriminated against receives no less than the amount it would have been entitled to receive if there were no discrimination, and 36 months of the debtor's disposable income were applied to make payments under the plan. *Id.* at 755. . . . The second prong of the *Simmons* Test need only be modified to mirror the 2005 Amendments. Thus, a plan does not discriminate unfairly if the class discriminated against receives no less than it would have received if there were no discrimination and 60 months (or 36 months for below-median income debtors) of the debtor's disposable income were applied to the plan. This modification does not change the principle of the *Simmons* Test—as long as the class discriminated against receives its fair share of the [Unsecured Creditors Pool], the discrimination is not unfair, and not in violation of section 1322(b)(1).[11]

---

[10] As noted above, § 1322(b)(1) provides a "plan may . . . designate a class or classes of unsecured claims, as provided in section §1122 of this title, but may not discriminate unfairly against any class so designated . . . ."

[11] *In re King*, 460 B.R. 708, 711-712 (Bankr. N.D. Tex. 2011).

In *In re Machado*, the United States Bankruptcy Court for the District of Massachusetts found the 60-month plan proposed by below-median income debtor did not discriminate unfairly, but also held payments to cure arrearages in the student loan debt must be made through the Chapter 13 Trustee.[12] In determining the proposed plan by the below-median income debtor did not discriminate unfairly, the Court set forth a four-pronged test:

> Four considerations inform my decision in this matter. First, Congress, by its exception of student loan obligations from discharge, has long made clear the legislative objective of student loan repayment. The Plan treatment of the Debtor's student loan debt furthers the goal by routing Plan resources toward such repayment in accordance with the stated Code provisions.
>
> Second, for debts whose terms extend beyond the period of a chapter 13 plan—often including, precisely because of their nondischargeability, student loan obligations—Congress has further expressly permitted a debtor to elect to cure and maintain that debt. Here, the Debtor has elected this option, which channels only so much money to the student loan creditors as is necessary to cure the prepetition arrearage and ensure that she will not emerge from bankruptcy in arrears on these obligations. If she were to forego this option and pay an equal percentage to both student loan creditors and other nonpriority unsecured creditors, she would emerge from bankruptcy more deeply in arrears than she went into bankruptcy, a result that cannot be fair to her or consistent with the evident intent behind sections 523(a)(8) and 1322(b)(5).
>
> Third, the financial differential resulting from the proposed discrimination is modest. The Debtor's applicable commitment period (and thus plan term) is thirty-six months. If she dedicated the combined $276.20 and $250 to the entire $43,084 pool of unsecured debt (as advocated by the trustee) for that period, the dividend on all unsecured claims would be 6.76%, or approximately $700 more than the 4.14% provided in the Plan for the non-student loan claims. I find no unfairness in this differential warranting denial of Plan confirmation.
>
> Fourth, perhaps reflective of that modest differential, no holder of a non-student loan unsecured claim has objected to the treatment of such claims under the Plan.
>
> Taking into account the identified policy considerations, the available resources, the foregoing allocation among the plan constituencies, and the absence of objection by any affected creditor, I find that, in the circumstances

---

[12] *In re Machado*, 378 B.R. 14, 16-18 (Bankr. D. Mass. 2007).

of this case, the proposed discrimination as against non-student loan claims is fair.[13]

Here, the parties' Stipulated Facts indicate general unsecured claims filed as of December 4, 2011 are $191,661.45. However, the Court's Order of February 23, 2012 disallowed Claim 6-1 filed by the Internal Revenue Service, of which $14,823.39 was a general unsecured claim. In addition, the Debtors propose to pay, contemporaneously with Class 1 priority debts, the unsecured criminal restitution claim of $1,800.00 to the City and County of Denver; the Trustee has not objected to this provision. This leaves the Debtors with general unsecured claims of $175,038.06, of which $51,817.51 are stipulated to be student loan claims.[14] No cure amounts are listed for the student loan debts.

Under the Amended Plan, Class 4 creditors other than the student loan creditors and the restitution creditor will receive, over 60 months, $1,145.00 on their claims of $123,220.55.[15] This results in a return to these creditors of 1%.[16] However, the student loan unsecured creditors will receive 64% of their filed claims.[17]

The addition of $550.00 per month would increase the total amount paid under the Amended Plan by $33,000.00 over the 60 months. The resulting $34,145.00 paid into the plan, less the proposed $9,000 in attorney's fees and costs, less approximately $3,400.00 for trustee's fees, would leave approximately $21,745.00 for unsecured creditors, resulting in a 12% return for student loan and non-student loan unsecured creditors.[18]

The Debtors' Amended Plan meets the first prong of the *King/Simmons* test described above because the separate classification of a nondischargeable student loan debt serves a rational purpose. The second prong of the *King/Simmons* test requires the general unsecured creditors to receive no less than they would have received if there were no discrimination and 60 months of the Debtors' disposable income were

---

[13] *Id.* at 17.

[14] $191,661.45 – ($14,823.39 + $1800.00) = $175,038.06

[15] Specifically, Subsection D of the Amended Plan provides Class 4 claims are divided into Class One, the City and County of Denver restitution claim to be paid $1,800.00 contemporaneously with Class 1 priority claims, and Class Two, all other allowed unsecured claims to be paid $1,145.00.

[16] $1,145.00 ÷ $123,220.55 = .01. The parties' Stipulated Facts, paragraph 16, indicates Class 4 non-restitution claims will receive 6% of the claims filed through December 4, 2011. However, this calculation occurred before the Court's February 23, 2012 Order disallowing the claim of the IRS.

[17] $33,000 is 64% of $51,817.51.

[18] $9,000.00 + $3,400.00 =$12,400.00. $34,145.00 – $12,400.00 = $21,745.00. $21,745.00 is 12% of $175,038.06.

applied to the plan. It is with this second prong the Debtor's Amended Plan creates unfair discrimination. The general unsecured creditors will receive only 1% of their claims under the Amended Plan, but would receive 12% of their claims if the additional $550 were available to be paid into the plan. This is a significant difference, even considering the student loan debt of $51,817.51 would be added back into the total of Class 4 claims. Therefore, the Amended Plan discriminates unfairly and cannot be confirmed under the *King/Simmons* test.

Under the *Machado* framework, also discussed above, the Amended Plan meets the first prong of furthering Congress' goal of student loan repayment, and meets the second prong of furthering Congress' goal of allowing the cure and maintenance of long term debt. The Debtors do not propose to cure student loan arrearages, and there has been no evidence presented to indicate whether post-petition interest would place the Debtors in a worse position at the end of their plan in which they did not maintain their regular payments. The Amended Plan meets the fourth *Machado* prong, as no holder of a non-student loan unsecured claim objected to the Amended Plan. However, as to the third *Machado* prong, the Amended Plan must fail for unfair discrimination, as set forth in detail with respect to the *King/Simmons* analysis.[19]

Under both the *King/Simmons* and *Machado* analyses, therefore, the Amended Plan cannot be confirmed, and it is

IT IS ORDERED the Trustee's Objection to the Amended Plan is sustained.

IT IS FURTHER ORDERED confirmation of the Amended Plan is DENIED.

Dated April 26, 2012                By the Court:

                                                                Michael E. Romero
                                                                United States Bankruptcy Judge

---

[19] The Court notes the Debtors have apparently attempted to make the Amended Plan less unfairly discriminatory by extending it to 60 months, instead of the 36-month minimum required. However, under either a 36-month or a 60-month plan, the disparity between payments to student loan creditors and other unsecured creditors would create unfair discrimination in violation of § 1322(b)(1).